UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Danny Vinci,<br><br>                              Petitioner,<br><br>vs.<br><br>Daniel Paramo, Warden,<br><br>                              Respondent. | Civil No.     13cv1756 BTM (PCL)<br><br>**REPORT AND RECOMMENDATION RE: PETITION FOR WRIT OF HABEAS CORPUS** |

## I.  INTRODUCTION

A jury convicted Petitioner Danny Vinci ("Petitioner") of assaulting with caustic chemicals, making a criminal threat, resisting a peace officer, inflicting corporal injury to a former spouse, and failing to appear in another criminal matter, along with true findings that Petitioner had suffered five prison prior offenses, one of which qualified as a serious felony and a "strike" offense. The court sentenced Petitioner to a total term of sixteen years and four months. (Lodgment 1, at 391.)

Challenging his conviction, Petitioner presents four claims in the body of his federal petition: 1) California Evidence Code section 1109 is unconstitutional on its face, violating due process and equal protection under the Fifth and Fourteenth Amendments; 2) Evidence Code section 1109 is unconstitutional as applied in his case; 3) the trial court's admission of propensity evidence constituted prejudicial error; and 4) the trial court improperly admitted an unavailable witness's prior testimony in violation of the

Confrontation Clause. (Doc. 1, at 17-33.)

Respondent filed an answer to the petition, arguing for its denial. (Doc. 30.) Petitioner did not file a traverse. For the reasons set forth below, the Court recommends the petition be DENIED.

**II.    PROCEDURAL BACKGROUND**

On July 21, 2011, a San Diego jury found Petitioner guilty of assaulting with caustic chemicals, making a criminal threat, resisting a peace officer, inflicting corporal injury to a former spouse, and failing to appear in another criminal matter. Petitioner admitted that he committed counts 1, 2, and 4 while he was out on bail. The trial court found that Petitioner had served five prior prison commitments, one of which qualified as both a "strike" and "nickel" prior. The court sentenced Petitioner to a total term of sixteen years and four months.

On appeal, Petitioner challenged the constitutionality of California Evidence Code section 1109 and claimed that his right to confront a witness had been violated by admission of an unavailable witness's prior testimony. (Lodgment 3.) The California Court of Appeal denied these claims and affirmed the judgment. (Lodgment 6.) Petitioner filed a petition for review in the California Supreme Court. (Lodgment 7.) The court summarily denied the petition. (Lodgment 8.)

Petitioner did not seek collateral review in the state courts. The instant federal petition consists of claims he made on direct appeal.

**III. STATEMENT OF FACTS**

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see also Sumner v. Mata, 449 U.S. 539, 550 (1981) (holding in part: findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following facts are taken verbatim from the California Court of Appeal's opinion:

Kopp met Vinci in 1996. After dating a few months, Vinci was arrested. While

Vinci was incarcerated, Vinci and Kopp married. Shortly thereafter, Kopp changed her mind and divorced Vinci while he was still incarcerated. Kopp did not hear from Vinci again until August or September 2008, when he called her.

Kopp and Vinci met face-to-face in December 2009 at Kopp's sister's house. Kopp had not seen Vinci since they were married in 1996. Kopp and Vinci began dating again. According to Kopp, they also were both using drugs. After a short while, Kopp testified "things started getting strange between" her and Vinci. For example, Vinci started questioning Kopp about her whereabouts and her acquaintances. Kopp also found a tape recorder near Vinci that had fallen out of Vinci's pocket while he was sleeping. Kopp listened to the tape recording and found it contained a conversation between her and a girlfriend that occurred in the kitchen of Kopp's home when Vinci was not present.

In early February 2010, Kopp confronted Vinci regarding the contents of a large trash bag Vinci was carrying as he was leaving Kopp's house. Kopp was concerned that Vinci might be taking some of her estranged husband's tools that were stored in the garage. Vinci became angry. In response, Kopp took a swing at Vinci but missed. Vinci in turn "got really angry" according to Kopp, took the bag and slammed it down on the top of Kopp's head, knocking her to the floor. Kopp described the blow as "extremely hard."

The next day, Kopp learned from a friend who had done a search of Vinci that he had restraining orders against him from three other women, none of whom she knew, which Kopp said "really scared" her. Kopp prepared and presented a letter to Vinci informing him that their relationship was over and that he had a day to move his belongings from her residence.

Late one evening in mid-February 2010, while Kopp was in her bedroom she saw a red "laser light" coming through the sliding glass door. She knew Vinci had a flashlight with a laser light on it as she had seen Vinci use it many times. When Kopp and her girlfriend went outside to lock their cars, her girlfriend told Kopp to "get in the house" because Vinci was standing in Kopp's yard. Kopp and her girlfriend ran back inside Kopp's house and called police. The police responded and patrolled the area looking for Vinci, but by then he was gone.

On another occasion when Kopp was leaving in a truck from her mother's house, she saw Vinci standing outside, near a granny flat where her sister lived. Vinci unsuccessfully tried to speak with Kopp as she drove past him. Vinci then got inside his car and began pursing Kopp, who also had her granddaughter and niece inside the truck. Vinci stopped pursuing Kopp when she drove into the parking lot of a police station about four miles from her mother's house.

Despite these incidents, Kopp and Vinci spent one more night together on February 20, 2010, because of "drugs and sex" according to Kopp. The following morning, when Kopp awakened in her bed about 6:00 a.m. she heard the sounds of running water coming from the bathroom. After awhile, Vinci came out of the bathroom fully clothed, but with his face and hair wet. Kopp went to the living room and sat on the couch. Vinci asked Kopp to return to the bedroom. When she refused, they exchanged words and then Vinci came at Kopp, pushed her down on the couch, and pressed his knuckles against her windpipe. As he pressed on her throat, Vinci said to Kopp, "I have to do this."

Kopp testified she could not move because Vinci was on top of her and she could not breathe because of the pressure he was applying to her neck. Kopp struggled

1
2
to roll onto her knees. Vinci stayed on top of her and continued to press on her neck. Kopp testified she felt herself "slipping away."

3
4
5
6
With Vinci still on top of her choking her, Kopp tried unsuccessfully to yell out to her daughter, who was in her bedroom on the opposite end of the house. At that point, one of Kopp's dogs came into the room and lunged at Vinci. Kopp managed to free herself and run out the front door to a neighbor's house across the street. As Kopp waited across the street for police to arrive, she saw Vinci come out of the house and leave in his car. As a result of this incident, Kopp's neck, face, chest and arms were bruised, blood vessels in her eyes had burst, and her tongue was lacerated from having bitten it during the struggle.

7
8
9
10
11
In mid-March 2010, Kopp went to a dance studio to pick up her daughter from dance practice. As she sat in her car waiting, Kopp smelled the strong order of gasoline. When Kopp looked up, she saw Vinci, who was familiar with Kopp's routine, standing behind her car. Kopp next tried to open her car door but Vinci pushed it closed. Kopp managed to open the door and attempted to step out of the vehicle. As she did, Vinci sprayed her ostensibly with gasoline. Vinci next attempted to ignite a lighter, and as he did, he told Kopp, "You're going to die, you fucking bitch." When he was unable to get the lighter to work, Vinci ran to his truck and fled.

12
13
14
15
16
17
In late March 2010, Vinci was riding with his nephew, Joseph Pearson, and Pearson's friend in Pearson's truck. They had just left Vinci's mother's residence when a police patrol car heading in the opposite direction passed them. The officer ostensibly recognized Vinci because the officer quickly made a U-turn and started following the truck. After a short distance, the officer turned on the car's overhead lights in order to pull over the truck. According to Pearson, Vinci started "getting upset" and "freaking out" and as Pearson began to pull over, Vinci instructed Pearson to stop the truck. Vinci jumped out of the truck and started running to his own car, which was parked nearby. When the officer started to give chase, Vinci ran to a parking lot where he ultimately gave himself up after the officer threatened him with a Taser.

18
19
20
21
22
23
A search of Vinci's vehicle pursuant to a warrant yielded several disposable lighters, fuel cells, three "propane-type torches," a "welder's torch lighter" and an empty five-gallon gasoline can in the backseat. Police also found several handwritten notes, including one addressed to the "Oceanside cops" that on the backside read, "The gas weapon is inside, and the gas is real, the lighter, what do you think?" Also inside the vehicle were several notes written on envelopes, including one that read, "You never treated me with love, just lies, it's all about you and what you wanted, drugs have mad[e] you someone else." On another envelope, in the upper left hand corner where typically an addressee puts a return address, was the writing, "Death and Hell, P.O. Box Lies, Vista." That envelope was addressed to Kopp at her home.

24
25
26
Another envelope recovered from Vinci's car read: "I'm not going to prison for you, not one day. You made me this way. I asked you not to lie to me or cheat on me. This is your way of life. You're a drug slut. You will never be the same .... [Your] selfish ways have killed me. You can count all the lies you have told me. What about all the times you really hurt me."

27
(Lodgment 6, at 3-7.)

28
Each of Petitioner's claims concerns the admission of evidence regarding his

commission of prior acts of domestic violence. The California Court of Appeal summarized the testimony in question as follows:

> Jackie O'Dell testified she dated Vinci in 1999 for about three weeks. She testified that after they had been dating about two weeks, Vinci started to become "possessive" and wanted to know where she was "at all times, who [she] was with, what [she] was doing," and was "constantly calling." When O'Dell told Vinci she did not want to date anymore, he responded by telling her he did not understand her decision, by making even more phone calls to her, including calling her 35 times "in a couple of hours time" and by watching her while she was working.
>
> O'Dell testified she next agreed to meet Vinci face-to-face. Because Vinci's conduct scared O'Dell, she agreed to meet with him at his mother's residence. Vinci met O'Dell outside and suggested they talk in the garage. O'Dell entered the garage through a side door. Vinci followed and then locked the door behind her, telling her she was not going anywhere. When O'Dell went to open the door to leave, Vinci pushed her down to the floor.
>
> O'Dell testified she managed to escape from the garage, ran to the back of Vinci's mother's residence and entered the residence through a sliding glass door. Once inside, O'Dell asked Vinci's mother to call 9-1-1, telling Vinci's mother that her son "was trying to hurt me" and he "wasn't going to let me leave." Vinci's mother refused to call the police on her son. As O'Dell picked up the phone to make the call herself, Vinci entered the residence and ripped the telephone (e.g., the cord from a landline) out of the wall. O'Dell told Vinci's mother she wanted to leave and asked Vinci to return her keys, which O'Dell surmised fell from her pocket when he pushed her to the floor. Vinci's mother told her son to return O'Dell keys and O'Dell grabbed them from Vinci and fled. Before she sped away, Vinci came outside, began yelling at O'Dell and then took his fists and slammed them down on the hood of her truck, denting it.
>
> As O'Dell drove down the street, she saw Vinci in the rearview mirror following behind her in his mother's minivan. Vinci then chased O'Dell through the streets of Vista. O'Dell testified she finally managed to lose him, went home and locked her doors because she was fearful of Vinci. She later obtained a restraining order against Vinci.
>
> Amy Seckman testified[FN7] she met Vinci in 2000. According to Seckman, they did drugs together and had a brief sexual relationship. When Seckman broke off their relationship, Vinci responded by leaving notes to her, by calling her "at all hours of [the] night" and by coming to her house and her work.
>
> Seckman estimated that on one day Vinci called her about 20 times. That same day, as Seckman sat in her living room at night with a male friend doing drugs, Vinci called and told Seckman that he knew Seckman had a male friend inside her house and that he did not like this person. Vinci called Seckman a "bitch" and a "whore."
>
> > FN7. As discussed post, Seckman, who lives out of state, was unable to appear personally to testify at trial because of a sickness in her family. The trial court ruled Seckman was unavailable and allowed her former testimony to be read into the record.
>
> Shortly after the call ended, Seckman testified a wooden patio chair came crashing through her living room window, breaking the window. Seckman testified she was

>hit in the back by glass and by the chair, injuring her. In response, one of Seckman's neighbors called police.
>
>Five minutes after the chair incident, with police present, Vinci called Seckman yet again and told her that he knew the police were at her house and that he was pointing a gun at her. Seckman left for the weekend because she was afraid of Vinci. When she returned, the word "slut" was written on a window of her house; she also found notes left on her car saying she was a "whore," a "bitch" and a "slut" and four or five hypodermic needles stuck in the deflated tires of her car and one in her car door.
>
>Casha Leicester testified she met Vinci in 2004. They did drugs together and eventually moved in together. In March 2005, they got married while Vinci was incarcerated. On his release, everything seemed fine according to Leicester until one day in early July 2005 when Vinci wanted to have sex. When Leicester told Vinci she was not feeling up to sex, Vinci got angry, called her a "fucking bitch" and then hit Leicester in the back of the neck with a closed fist. Leicester described the blow as painful. Leicester had seen the blow coming and was able to cover up her face.
>
>When Leicester returned to the house the following day, Vinci had placed a padlock on the garage door. Leicester in response called police and also reported the hitting incident from the day before. She obtained a restraining order against Vinci.

(Lodgment 6, at 14-17.)

## IV.   DISCUSSION

### A.  Standard of Review

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); Early v. Packer, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  See Yarborough v. Gentry, 540 U.S. 1, 4 (2003); Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. See Bell v. Cone, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. Id. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." See Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. See Ylst v. Nunnemaker, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by Andrade, 538 U.S. at 75-76); accord Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. See Early, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law. Id. Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." Andrade, 538 U.S. at 72.

Where the state court did not reach the merits of a claim because of the

7

1  imposition of a state procedural bar, "there is no state court decision . . . . to which to
2  accord deference." Pirtle, 313 F.3d at 1167. Thus, this Court must review those
3  claims *de novo*. Id. However, AEDPA "does not require a state court to give reasons
4  before its decision can be deemed to have been 'adjudicated on the merits.'"
5  Harrington v. Richter, 131 S. Ct. 770, 785 (2011). "Rather, as [the Supreme Court]
6  has explained, '[w]hen a federal claim has been presented to a state court and the
7  state court has denied relief, it may be presumed that the state court adjudicated the
8  claim on the merits in the absence of any indication or state-law procedural principles
9  to the contrary.'" Johnson v. Williams, 133 S. Ct. 1088, 1094 (2013) (quoting
10 Richter, 131 S. Ct. at 785).

**B.     Analysis**

   1. Claim 1: California Evidence Code section 1109 is unconstitutional on its face, violating his due process and equal protection rights.

In ground one, Petitioner argues that California Evidence Code section 1109 is facially unconstitutional on due process and equal protection grounds. (Doc. 1, at 17, 13-28.) Evidence Code section 1109 provides an exception to the general restriction against propensity or character evidence in a criminal action so that it can be used against a defendant accused of domestic violence so long as the evidence does not render the trial fundamentally unfair. The California Court of Appeal rejected Petitioner's due process challenge by relying on People v. Falsetta, 21 Cal. 4th 903 (1999), which held that a statute that provides for propensity evidence in sexual assault cases does not violate due process because it provides a mechanism for exclusion in cases where the propensity evidence would create undue prejudice to the defendant. Id. at 912-915. Moreover, the California Court of Appeal rejected Petitioner's equal protection argument by citing People v. Jennings, 81 Cal. App. 4th 1301 (2000), which held that domestic violence defendants are not "similarly situated" to all other criminal defendants, and, even if they were, the rational basis test was satisfied. Id. at 1311-13. In this case, the California Court of Appeal's

decision should stand for the following reasons.

"Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting 28 U.S.C. § 2254(d)). Here, "the 'Supreme Court has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith.'" Alberni v. McDaniel, 458 F.3d 860, 863 (9th Cir. 2006) (quoting Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001)). Also, the Supreme Court has expressed no opinion regarding whether the admission of prior bad acts in some cases, but not others, violates the Equal Protection Clause. See Carey v. Musladin, 549 U.S. 70, 77 (2006); see also LeMay, 260 F.3d 1018, 1030-31 (9th Cir. 2001) (holding that the federal rule permitting propensity evidence in child molestation cases neither discriminates against a suspect class nor infringes upon a fundamental right.). Thus, the state court's rejection of Petitioner's due process and equal protection challenges to Evidence Code section 1109 cannot have been contrary to, or an unreasonable application of, clearly established federal law. See Carey v. Musladin, 549 U.S. 70, 77 (2006) (where Supreme Court precedent gives no clear answer to the question presented, "it cannot be said that the state court 'unreasonab[ly] appli[ed] clearly established Federal law'"). Petitioner is not entitled to habeas relief on Claim 1.

2. Claim 2: California Evidence Code section 1109 is unconstitutional as applied.

In ground two, Petitioner claims that California Evidence Code section 1109 is unconstitutional "as applied." He argues that propensity evidence in domestic violence cases should be used only in cases involving "uncooperative" victims. (Doc. 1, at 16.) The state courts rejected this claim because no such restriction exists in

California state law:

> We also reject Vinci's contention that Evidence Code section 1109 is unconstitutional as applied to him because the Legislature allegedly intended to limit this statute to address "difficulties of proof" where victims of domestic violence are unwilling to cooperate, which he contends was not the case here. However, if the Legislature had wanted to limit the use of prior bad acts evidence in Evidence Code section 1109 (or in related Evidence Code section 1108, for that matter) as Vinci contends, it certainly could have done so. We note from the language of Evidence Code section 1109 that the Legislature did not so limit the statute, nor can we: "'Crafting statutes to conform with policy considerations is a job for the Legislature, not the courts; our role is to interpret statutes, not to write them. [Citations.]'"
>
> In any event, Vinci cites no authority, nor are we aware of any, for the proposition that evidence regarding prior bad acts of domestic violence committed by a defendant in a case with an "uncooperative" victim (however that term is defined) of domestic violence is somewhat unconstitutional.

(Lodgment 6, at 13-14.)

As federal intervention in state court proceedings is only justified when there are errors of federal law, Oxborrow v. Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989), and as federal habeas courts are bound by a state's interpretation of its own law, Estelle v. McGuire, 502 U.S. 62, 68 (1991) (federal courts may not "reexamine [a] state-court determination on state-law questions"), this court is bound by the state court's interpretation of California Evidence Code section 1109 and its application in Petitioner's case. Petitioner is not entitled to relief on ground two.

3. Claim 3: The trial court's admission of propensity evidence constituted prejudicial error.

Petitioner claims that the trial court committed prejudicial error by permitting the prosecutor to introduce evidence of his prior acts of domestic violence. (Doc. 1, at 27.) The state court analyzed and rejected the claim as follows:

> We conclude the trial court properly exercised its broad discretion when it concluded the prior incidents of domestic violence by Vinci were admissible under Evidence Code sections 1109 and 352, including those acts involving O'Dell, which occurred a little more than 10 years before the charged offenses.[FN8] (See Evid.Code, § 1109, subd. (e); see also People v. Rodrigues

10

>  (1994) 8 Cal. 4th 1060, 1124-1125 [a trial court has broad discretion in determining whether the probative value of evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues or mislead the jury].)
>
>   FN8. We note the record that Vinci was incarcerated for extended periods of time during the 10-year period between the domestic violence involving O'Dell and the charged offenses, including from August 2003 to November 2003 and then from November 2004 until April 2008. (See People v. Harris (1998) 60 Cal.App.4th 727, 739 [noting the "'staleness' of an offense is generally relevant if and only if the defendant has led a blameless life in the interim."].)
>
>  First, the record shows the evidence of such prior acts by Vinci did not take an undue amount of time. Second, despite Vinci's contentions otherwise, the probative value of the prior acts of domestic involving each victim was strong because the prior acts and the charged offenses were all of the same general character and tended to involve drug use, threats of violence and violence by Vinci against a former partner seeking to end their relationship. (Compare People v. Harris, supra, 60 Cal. App. 4th at 738.)
>
>  Third, the prior acts of domestic violence involving the three victims were not more inflammatory than the charged conduct, which included Vinci choking Kopp on one occasion when she felt herself "slipping away" and dousing Kopp with gasoline-type substance on another occasion and then trying to light her on fire. (See People v. Rucker, supra 126 Cal. App. 4th at 1119 [relevant factors in determining prejudice under Evidence code section 1109 and 352 include whether the prior acts of domestic violence are more inflammatory than the charged conduct].)
>
>  For these reasons, we conclude the trial court acted well within its discretion under Evidence Code section 1109, subdivision (a) when it ruled to admit Vinci's acts of prior domestic violence.

(Lodgment 6, at 19-20.)

In a prosecution for a domestic violence offense, Cal. Evid. Code section 1109 permits evidence of the commission of another instance of domestic violence provided that it is not inadmissible under Cal. Evid. Code section 352 (prejudicial effect of the evidence outweighs its probative value). Trial courts must engage in a careful weighing process under section 352 in order to properly decide whether a specific act of domestic violence should be admitted or excluded. See People v. Falsetta, 21 Cal. 4th 903, 916-917 (1999). However, on federal habeas review, this

11

1  court has no authority to review alleged violations of a state's evidentiary rules
2  including whether the trial court properly weighed the evidence under section 352.
3  See Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998). Federal habeas relief
4  can only be granted for improperly admitted evidence only if that error rendered the
5  trial so fundamentally unfair as to violate due process. Estelle v. McGuire, 502 U.S.
6  62, 68, 70 (1991). Constitutional due process is violated if there are no permissible
7  inferences that may be drawn from the challenged evidence. Jammal v. Van de
8  Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991). "Evidence introduced by the prosecution
9  will often raise more than one inference, some permissible, some not." Id. at 920. "A
10 habeas petitioner bears a heavy burden in showing a due process violation based on
11 an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).

12      Here, the prior acts of domestic violence and the charged offenses "were all of
13 the same general character and tended to involve drug use, threats of violence and
14 violence by [Petitioner] against a former partner seeking to end their relationship."
15 (Lodgment 6, at 19-20.) The prior acts of domestic violence were introduced to
16 establish the permissible inference that the defendant committed the charged crime
17 because he had a propensity to do so. Thus, Petitioner's due process rights were not
18 violated by the introduction of any of his prior acts of domestic violence because they
19 were relevant and the jury could permissibly infer that Petitioner had a tendency to
20 abuse women. Petitioner is not entitled to relief on this ground.

21      4. Claim 4: The trial court improperly admitted an unavailable witness's prior
22 testimony in violation of the Confrontation Clause.

23      In ground four, Petitioner claims his right to confront a witness was violated by
24 the admission of an unavailable witness's prior testimony. (Doc. 1, at 33.) The state
25 court rejected this claim because the U.S. Supreme Court has expressly stated that
26 such evidence is admissible in such circumstances. (Lodgment 6, at 21-22.)

At issue is the testimony of Amy Seckman, which the California Court of Appeals described as follows:

> The record here shows that Seckman intended to testify at trial but could not do so because her daughter had surgery. In disclosing this fact, the prosecutor noted that Seckman, although living out of state, had not been subpoenaed because all along she had been cooperative, including voluntarily appearing to testify in Vinci's first trial,[FN9] where she was subject to cross examination. Based on the prosecutor's representation, the trial court ruled Seckman was "medically unavailable" and, as noted ante, allowed her former testimony on direct and cross-examination to be read into the record.
>
> FN9. Vinci's first trial ended in a mistrial after a witness (not Seckman) testified about an incident previously ruled inadmissible by the court.

(Lodgment 6, at 21.)

The Confrontation Clause of the Sixth Amendment to the U.S. Constitution provides that in all criminal prosecutions the accused shall have the right to confront the witnesses against him. Idaho v. Wright, 497 U.S. 805, 813 (1990). In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that out-of-court testimonial statements must be excluded under the Confrontation Clause unless the witness is ruled unavailable and the defendant had a prior opportunity to cross-examine the witness. Id. at 59. "[A] witness is not 'unavailable' for purposes of the ... exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." Barber v. Page, 390 U.S. 719, 724-25 (1968). A federal habeas court may not overturn a state court's decision on the question of unavailability merely because additional steps might have been taken to make the witness available. Hardy v. Cross, 132 S.Ct. 490, 495 (2011) (per curiam). Under AEDPA's deferential standard of review, "if the state court decision was reasonable, it cannot be disturbed." Id.

Here, the witness whose testimony is in question was ruled medically unavailable to testify in Petitioner's second trial because her daughter had a scheduled surgery. It was not necessary for the prosecutor to take the extra step of

subpoenaing this witness because she had been cooperative in the course of the investigation and in her prior courtroom appearances and because she had a valid excuse for not being able to attend Petitioner's second trial. As the defendant's attorney had cross-examined this witness at the time of her prior testimony, this testimony was deemed sufficiently reliable to satisfy the confrontation requirement. As Petitioner has not shown that the state court's decision was unreasonable, Petitioner is not entitled to relief in ground four.

## V. CONCLUSION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered DENYING the petition.

IT IS ORDERED that, **no later than November 17, 2014,** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objection to Report and Recommendation." The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir.1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.1991).

**IT IS SO ORDERED.**

DATED: October 27, 2014

Hon. Peter C. Lewis
U.S. Magistrate Judge
United States District Court